**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| CARRIE BIRKEL, an individual, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| EDWARD MCNICHOLAS, ESQ. and | ) | Jury trial demanded |
| SIDLEY AUSTIN, LLP, a limited liability | ) | |
| partnership, | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT**

Plaintiff, Carrie Birkel (hereinafter "Birkel"), by and through her attorney, Edward X. Clinton, Jr. and The Clinton Law Firm, LLC, brings her Complaint against the Defendants, Edward McNicholas, Esq. (hereinafter "McNicholas") and Sidley Austin, LLP (hereinafter "Sidley Austin"), a limited liability partnership. Plaintiff alleges and avers as follows:

**Introduction**

Birkel's claims arise out of a truly bizarre set of circumstances that would seem more appropriate for an episode of "Law and Order" than in reality. In late January 2014, she was approached in a restaurant near her home in California by a man she later found out was Joseph Dean Garcia (hereinafter "Garcia"). Garcia lauded his company, Strategic Investigative Services, and his experience as a former member of the United States Armed Forces, Naval Special Warfare Development Group (commonly known as Navy SEALs). Within two (2) weeks, unprompted and unrequested by Birkel, Garcia produced photographs of Birkel's husband in a compromising position with another woman and provided assistance in getting Birkel's nephew pending criminal case in Marin County, California.

Garcia introduced Birkel to Defendant McNicholas, a Partner with Defendant Sidley

Austin, who specialized in cybersecurity, information technology, and privacy. Based on Garcia's recommendation of McNicholas, Birkel entered into an attorney-client relationship with Sidley Austin wherein he would "vet" potential family law attorneys for Birkel. Garcia had an office at Sidley Austin's Washington D.C. office, a Sidley Austin business card, and his company, Strategic Investigative Services, was listed as protected by Sidley Austin's work-product privilege in Birkel's engagement letter. McNicholas also sent Birkel an Engagement Letter requesting a two hundred and fifty thousand ($250,000.00) dollar retainer for Sidley Austin to represent Birkel's nephew in his criminal matter.

Birkel did not retain McNicholas or Sidley in her nephew's criminal matter, but paid a twenty-five thousand ($25,000.00) dollar retainer, all of which was utilized by McNicholas. McNicholas arranged for representation by a Chicago family law attorney who conducted private mediation of Birkel's divorce which was concluded in October 2014. Although McNicholas' official representation of Birkel ended on June 12, 2014, Birkel continued to communicate with McNicholas concerning other legal matters.

As Birkel's divorce mediation finalized, she realized that she would be obtaining a ten million ($10,000,000.00) dollar settlement through the divorce. Garcia arranged for a meeting at Sidley Austin's Washington D.C. office with McNicholas and others concerning Birkel's potential investment in ToyBox Technologies, Inc. (hereinafter "ToyBox"). McNicholas never informed Birkel that ToyBox had also entered into an attorney-client relationship with Sidley Austin in July 2014 and incorporated the entity on behalf of Garcia. McNicholas and Garcia, amongst others, pressured Birkel to invest in ToyBox based on an alleged Department of Defense (hereinafter "DOD") contract that would pay out millions in profits. McNicholas advised he was leaving his position at Sidley Austin to become General Counsel of ToyBox.

When Birkel asked for specifics on the contract, McNicholas advised that the terms were "classified" but that the payout would be vastly more than Birkel's investment. On October 17, 2014, based on McNicholas' and Garcia's representations, Birkel invested five million ($5,000,000.00) dollars to purchase 1,250 shares of ToyBox's common stock and provided an additional one million ($1,000,000.00) dollar loan.

On November 17, 2014, Garcia and his wife were indicted in the Southern District of Georgia for wire and mail fraud schemes dating to 2009. They later plead guilty and Garcia was sentenced to thirty-seven (37) months of imprisonment. This was not Garcia first brush with the law, as he had previously been convicted for wire and mail fraud, a fact never disclosed by McNicholas to Birkel. The purported DOD contract was a complete work of fiction from start to finish, and was merely used as a means to extract monies from Birkel. Birkel has managed to recover $4,791,122.72 of the funds she invested in ToyBox, leaving $1,208,877.28 unrecovered.

## Parties

1. Birkel is an individual and a citizen of the State of California where she principally resides.

2. Defendant McNicholas is an attorney licensed to practice law in Washington D.C. and Maryland. Upon information and belief, McNicholas is a citizen of the State of Virginia.

3. McNicholas works in Defendant, Sidley Austin's, Washington D.C. Office located at 1501 K Street, N.W., Washington D.C., 20005. His particular area of expertise is in cybersecurity, privacy, information technology, and data breach law. *See attached* Biography of McNicholas, marked as **Exhibit 1**.

4. Defendant Sidley Austin is a limited liability partnership with offices maintained throughout the world and its main office located in Chicago, Illinois. Sidley is a citizen of

Illinois.

## Jurisdiction and Venue

5.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 (2012) and 28 U.S.C. § 1367 (2012).   Venue is appropriate pursuant to 28 U.S.C. § 1391(b)(2), (b)(3) (2012). There is complete diversity of citizenship because plaintiff is a citizen of California and Defendants are citizens of Illinois and Virginia. The amount in controversy exceeds $75,000 exclusive of interest and costs.

6.      The Engagement Letter between Plaintiff and Defendants provides that all disputes shall be governed by, and construed in accordance with, the laws of the State of Illinois and that any claims brought under, or relating to, the Engagement letter shall be brought in the state or federal courts of Illinois.

## Statement of Facts

7.      Birkel is a resident of California who had been a full-time housekeeper for the years of her marriage.

8.      During her marriage, Birkel's role did not include handling the finances of the family, and her knowledge of financial documents was limited.

9.      Birkel and her former husband, Martin P. Birkel, were married on July 4, 1986. Upon meeting Garcia, her marriage had lasted for approximately seventeen (17) years, but for some time she had been unhappy.

10.     In January 2014, Birkel met Garcia in a restaurant near her home in California.

11.     Garcia lauded his former military background and his company, Strategic Investigative Services.

12.     Birkel confided in Garcia that she believed her husband was being unfaithful and

4

that she had a nephew that had been indicted for several violent crimes.

13.     Unprompted by Birkel, approximately two (2) weeks later, Garcia provided her pictures of her husband in a compromised position with another woman.

14.     Garcia proposed to Birkel that she should retain Defendant, Sidley Austin, in her nephew's criminal case and in her divorce case against her husband.

15.     The proposed engagement letter on the criminal matter requested a retainer amount of two hundred fifty thousand ($250,000.00) dollars.

16.     The proposed engagement letter in the divorce matter requested a retainer amount of twenty-five thousand ($25,000.00) dollars.

17.     Garcia introduced Birkel to McNicholas in early February 2014.

18.     McNicholas was a Partner at Defendant, Sidley Austin, specializing in cybersecurity, information technology, and data breach.

19.     McNicholas had no expertise in matrimonial or family law.

20.     McNicholas was not licensed to practice law in either California or Illinois.

21.     McNicholas had prior worked in the Clinton administration, as an Associate Counsel to President Clinton.

22.     On February 7, 2014, Birkel entered into an attorney-client relationship with Defendant Sidley Austin and executed an Engagement Letter.  A copy of the Engagement Letter is attached hereto and marked as **Exhibit 2**.

23.     The Engagement Letter stated, "[w]e will work closely with Strategic Intelligence Services as special case analysis and strategy consulting in handling your matters."  **Exhibit 2**, p. 1.

24.     An email from McNicholas to Birkel containing the Engagement Letter stated that

Garcia's Strategic Investigative Services, Inc. "has been working under Sidley [Austin]'s attorney work product protection" on Birkel's divorce action. A copy of the email is attached hereto and marked as **Exhibit 3**.

25. McNicholas' role as Birkel's attorney was to retain and vet a family law attorney who would handle her divorce.

26. However, neither Defendant McNicholas nor Defendant Sidley Austin vetted Garcia or Stategic Intelligence Services, as a search would have demonstrated prior arrests and convictions for a number of crimes, including wire and mail fraud.

27. Within a month, McNicholas had introduced Birkel to Saundra Rice, Esq. from Chicago, Illinois.

28. During the one-month period of vetting attorneys for "Project Dawn" as McNicholas termed Birkel's divorce in her Engagement Letter, McNicholas billed hours amounting to $27,149.03. *See* **Exhibit 2,** May 19, 2014 Invoice from Sidley Austin to Birkel.

29. Rice handled Birkel's divorce and obtained a ten million ($10,000,000.00) dollar settlement for Birkel through private mediation which was settled in early October 2014.

30. On June 12, 2014, Defendants sent Birkel an end-of-representation letter purporting to conclude the attorney-client relationship between himself and Birkel. A copy of the June 12, 2014 letter is attached hereto and marked as **Exhibit 4**.

31. Defendants' end-of-representation letter specifically stated that any "non-public information" supplied by Birkel would continue to be "held in confidence in accordance with applicable rules of professional responsibility."

32. Despite the official end of McNicholas' representation of Birkel, he continued to advise her on specific legal questions. *See* **Group Exhibit 5**, e-mails between Birkel and

McNicholas.

33.    Birkel thought of McNicholas as "her attorney."

34.    In July 2014, McNicholas was retained by Garcia to form an entity called ToyBox Technologies, Inc. (hereinafter "ToyBox") and GlobalTech Investment Group, Ltd.

35.    Upon information and belief, McNicholas received a retainer in the amount of one hundred thousand ($100,000.00) dollars to perform these menial administrative tasks.

36.    McNicholas' relationship with ToyBox went far beyond merely providing advice as its attorney, but rather he assisted Garcia in obtaining financing for the entity and prepared its balance sheet.

37.    McNicholas also intimated in a series of e-mails with Garcia that he would leave his position as a Partner with Sidley Austin and join ToyBox as its General Counsel.

38.    McNicholas never disclosed his relationship or retention by ToyBox to Birkel.

39.    McNicholas never obtained informed consent from Birkel to begin his representation of ToyBox, even though its interests could have been adverse to Birkel.

40.    In October, as Birkel's settlement from her divorce neared, McNicholas arranged for several meetings with Birkel, Garcia, and Garcia's wife (unbeknownst to Birkel) Karen Kay.

41.    These meetings took place at Defendant, Sidley Austin's, Washington D.C. office where both McNicholas and Garcia had offices.  A copy of Garcia's business card is attached hereto and marked as **Exhibit 6**.

42.    At this time both Garcia and McNicholas were aware that Birkel was set to receive approximately ten million ($10,000,000.00) dollars from her divorce settlement.

43.    Both Garcia and McNicholas presented Birkel with an investment opportunity through their newly formed entity, ToyBox.

44.     Although they failed to provide complete disclosure, Garcia and McNicholas presented Birkel with an ability to invest in ToyBox, who would use Birkel's investment capital to procure a Department of Defense contract (hereinafter "DOD Contract").

45.     In November 2014, McNicholas, Garcia, Kay, and Dana Harper (hereinafter "Harper"), who was CFO for Garcia's Strategic Investigative Services, Inc., met with Birkel at her California home to further discuss the opportunity from the DOD Contract.

46.     McNicholas, without advising Birkel of his conflict of interest or disclosing his representation of ToyBox, advised Birkel that she should invest in ToyBox.

47.     Birkel was presented with a balance sheet of potential profits for ToyBox from the DOD Contract that was prepared by McNicholas and Harper.

48.     McNicholas told Birkel that he would be leaving Sidley Austin to join ToyBox in the near future based on the financial opportunities there.

49.     Birkel was reticent to invest, since she had not been produced any contract.

50.     McNicholas told Birkel that she did "not possess the adequate clearances" to view the contract and was therefore "unable to provide her with more information."

51.     However, McNicholas vouched for the DOD Contract's existence and further reiterated his intent to join ToyBox.

52.     In further communications, McNicholas pressured Birkel to invest, stating that if Birkel did not provide her capital soon, they would lose the DOD deal.

53.     Birkel was eventually shown a spreadsheet of projected profits and return of investment within months.

54.     On October 17, 2014, Birkel executed a Stock Purchase Agreement, wherein she invested five million ($5,000,000.00) dollars in ToyBox to purchase 1,250 shares of its common

stock.  A copy of the Stock Purchase Agreement is attached hereto and marked as **Exhibit 7**.

55.     Birkel also agreed to provide an additional loan to ToyBox on January 20, 2015 for one million ($1,000,000.00) dollars.  A copy of the loan is attached hereto and marked as **Exhibit 8**.

56.     On February 11, 2015, Birkel transferred an additional three hundred thousand ($300,000.00) dollars to ToyBox for legal counsel in defense of ToyBox directors.  A copy of the confirmation e-mail is attached hereto and marked as **Exhibit 9**.

57.     On November 7, 2014, Garcia and his wife were indicted on unrelated charges of wire and mail fraud concerning another scheme to defraud in 2009 in the Southern District of Georgia.

58.     The indictments were sealed until January 2015.

59.     After the indictments were unsealed, Garcia and Kay were arrested and have been incarcerated since.

60.     Garcia and Kay eventually plead guilty to one count each and were sentenced to thirty-seven (37) months and twelve (12) months respectively.

61.     The DOD Contract touted by Garcia and McNicholas was a work of pure fiction, and never existed in reality.

62.     After obtaining Birkel's "investment" in ToyBox, Garcia converted and used these corporate funds not for the alleged DOD Contract, but rather for his own lavish lifestyle. These acts included:

    A.  Upon information and belief, Garcia rented a home in an exclusive subdivision of Orange County California and prepaid two (2) years rent for an amount in excess of eight hundred thousand ($800,000.00) dollars.

    B.  Upon information and belief, Garcia purchased numerous luxury automobiles;

    C.  Upon information and belief, Garcia transferred funds from ToyBox to his own personal account; and

D. Investigation continues as to Garcia's additional acts and gains based on his fraud against Birkel.

63.     Garcia's numerous material misrepresentations, breach of fiduciary duties, and successful inducing of Birkel to invest in a non-existent DOD Contract constituted acts of fraud by Garcia upon Birkel.

64.     Of the $6.3 million investment Birkel invested in Toybox, she has recovered $4,791,122.72 leaving $1,508,877.28 remaining.

65.     On January 1, 2010, the Illinois Supreme Court promulgated Illinois Rule of Professional Conduct 1.9 (hereinafter "Rule 1.9") which provides:

**RULE 1.9: DUTIES TO FORMER CLIENTS**

(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent.

(b) A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client

(1) whose interests are materially adverse to that person; and

(2) about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter; unless the former client gives informed consent.

(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

(1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or

(2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.

66.     Defendants were required to comply with Rule 1.9.

67.     Illinois Rule of Professional Conduct 1.6 (hereinafter "Rule 1.6") provides:

**RULE 1.6: CONFIDENTIALITY OF INFORMATION**

(a) A lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation, or the disclosure is permitted by paragraph (b) or

10

required by paragraph (c).

(b) A lawyer may reveal information relating to the representation of a client to the extent the lawyer reasonably believes necessary:

(1) to prevent the client from committing a crime in circumstances other than those specified in paragraph (c);

(2) to prevent the client from committing fraud that is reasonably certain to result in substantial injury to the financial interests or property of another and in furtherance of which the client has used or is using the lawyer's services;

(3) to prevent, mitigate or rectify substantial injury to the financial interests or property of another that is reasonably certain to result or has resulted from the client's commission of a crime or fraud in furtherance of which the client has used the lawyer's services;

(4) to secure legal advice about the lawyer's compliance with these Rules;

(5) to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, to establish a defense to a criminal charge or civil claim against the lawyer based upon conduct in which the client was involved, or to respond to allegations in any proceeding concerning the lawyer's representation of the client; or

(6) to comply with other law or a court order; or.

(7) to detect and resolve conflicts of interest if the revealed information would not prejudice the client.

(c) A lawyer shall reveal information relating to the representation of a client to the extent the lawyer reasonably believes necessary to prevent reasonably certain death or substantial bodily harm.

(d) Information received by a lawyer participating in a meeting or proceeding with a trained intervener or panel of trained interveners of an approved lawyers' assistance program, or in an intermediary program approved by a circuit court in which nondisciplinary complaints against judges or lawyers can be referred, shall be considered information relating to the representation of a client for purposes of these Rules.

(e) A lawyer shall make reasonable efforts to prevent the inadvertent or unauthorized disclosure of, or unauthorized access to, information relating to the representation of a client.

68.     Defendants were required to comply with Rule 1.6.

69.     Herein, Defendants were aware of Birkel's receipt of her marital settlement through her divorce proceedings, which was the very reason McNicholas was retained by Birkel.

70.     McNicholas used this knowledge for the benefit of his new client, ToyBox, in

11

which he stood to obtain a substantial interest.

71.     Upon information and belief, Defendants caused confidential information about Birkel to be shared with Garcia and ToyBox to Birkel's detriment, such as when she would receive her divorce settlement and the amount she would receive.

72.     As a result of Defendants' wrongful sharing of her personal information with Garcia and ToyBox, Birkel was damaged in that Garcia used information gleamed from Birkel's personal financial information.

73.     But for the actions of Defendants, Birkel would not have been damaged in that her confidential information would have remained confidential and she would not have had such information used against her to invest in ToyBox.

74.     Defendants' actions in failing to vet Garcia and Strategic Intelligences Services, Inc. as a partner in Birkel's divorce case also fell below the standard required in an attorney-client relationship.

75.     But for the actions of Defendants, Birkel would not have been damaged in that she would have known of Garcia's past criminal background and would not have invested any monies in ToyBox.

76.     As a result of Defendants' failures, Birkel has been damaged in an amount to be proven at trial, but not less than $1,508,877.28, the amounts she invested in ToyBox that remain uncollected.

## Count I – Legal Malpractice

77.     Birkel hereby incorporates by reference the allegations of the facts common to all Counts set forth in Paragraphs 1 through 76 of this Complaint.

78.     In order to prevail in a legal malpractice action, a plaintiff must plead and prove the following elements: (1) the existence of an attorney-client relationship which establishes the

attorney owed a duty to the client; (2) a negligent act or omission constituting a breach of that duty; (3) proximate cause establishing that "but for" the attorney's negligence, the plaintiff would have prevailed in the underlying action; (4) actual damages. *Purmal v. Robert N. Wadington and Assocs.*, 354 Ill. App. 3d 715, 720-21 (1st Dist. 2004).

79.    On or about February 7, 2014 the Defendants entered into an attorney-client relationship with Birkel.

80.    While acting as Birkel's attorneys the Defendants prosecuted her divorce case against her now ex-husband.

81.    While acting as Birkel's attorneys, the Defendants "work[ed] closely with Strategic Intelligence Services as special case analysis and strategy consulting in handling [Birkel's divorce]." **Exhibit 2**, p. 1.

82.    Even after Birkel's official attorney-client relationship with McNicholas and Sidley Austin ended, she continued to ask McNicholas for legal advice on unrelated topics to which he responded. *See* **Group Exhibit 5**.

83.    Birkel reasonably continued to believe that McNicholas was "her attorney" even after the end of their contractual relationship.

84.    Defendants performed legal work for Garcia and ToyBox.

85.    Defendants owed Birkel numerous duties: including a Duty of Care; a Duty of Loyalty; and a Duty of Confidentiality and a Duty of Good Faith and Fair Dealing.

86.    In addition, the Defendants had a duty to act in Birkel's best interests at all times, for services for which she was retained with reasonable care and skill, and to not expose Birkel to any unnecessary risk or peril, personally, emotionally or financially.

87.    The Illinois Rules of Professional Conduct and Illinois common law establish

reasonable professionalism standards as to the conduct of a reasonable attorney exercising skill, care and diligence in the profession as to current, concurrent or former clients, as it relates to these duties.

88. The Defendants breached the duty of care to Birkel by, among other things, failing to exercise reasonable care, skill and diligence that is commonly exercised by reasonable lawyers practicing in similar situations and thereby proximately causing damage to Birkel, including:

A. Negligently failing to vet Garcia and "Strategic Investigative Services, Inc." as partners on "Project Dawn" which was the name assigned by Defendants to Birkel's divorce matter (*See* **Exhibit 2**);

B. Negligently holding out Garcia and "Strategic Investigative Services, Inc." were Sidley Austin partners who had an office at Sidley Austin's Washington D.C. branch without performing an adequate review process (*See* **Exhibits 3** and **6**);

C. Negligently failing to disclose McNicholas' representation of ToyBox Technologies, Inc. to Birkel;

D. Negligently failing to obtain informed consent from Birkel to represent ToyBox when such representation may have been adverse to their former client, Birkel;

E. Upon information and belief, negligently sharing confidential information obtained through their representation of Birkel with Garcia for his use in obtaining funds from Birkel to invest in ToyBox;

F. Defendants negligently failed to undertake a conflicts check which would have disclosed Defendants' prior representation of Birkel and their prior representation of ToyBox thus breaching their duties pursuant to the Illinois Rules of Professional Conduct 1.0, 1.16, 1.7 and 1.9 and Illinois law;

G. Negligently allowing Garcia to engage in a series of actions intended to convert Birkel's funds for his own personal use through a fraudulent DOD Contract; and

H. Negligently failing to inform Birkel that Garcia had incorporated ToyBox Technologies, Inc. and that they had entered into an attorney-client relationship with ToyBox;

89. Defendants breached their duty of care, skill or diligence to Birkel by doing all of the acts and omissions as herein alleged.

90. Among other things, Defendants breached their duties to Birkel by committing the following acts:

      A.  negligently failing to properly counsel and advise Birkel;

      B.  placing their interest in charging fees above those of Birkel;

      C.  generally mishandling, and mismanaging confidential information; and

      D.  allowing concurrent joint representation which allowed Garcia to gain an unreasonable advantage over Birkel.

91. As a direct and proximate result of the Defendants' breaches of the duty of care, loyalty and confidentiality, Birkel was forced to incur excessive and unnecessary legal fees and expenses, exceeding over one million two hundred and fifty thousand ($1,250,000.00) dollars.

92. Furthermore, as a direct and proximate result of the Defendants' breaches of the duty of care, loyalty, and confidentiality, Birkel has sustained additional economic, emotional, and out-of-pocket losses and damages to be presented at trial in excess of $1,508,877.28.

WHEREFORE, Plaintiff, Carrie Birkel, prays for Judgment against Edward McNicholas, Esq. and Sidley Austin, LLP as set forth below:

    A.    For actual damages in a sum in excess of the jurisdiction of this Court according to proof;

    B.    For interest as allowed by law;

    C.    For costs of suit incurred herein;

    D.    For such other and further relief as the Court deems equitable and just.

### Count II – Aiding and Abetting Fraud

93. Birkel hereby incorporates by reference the allegations of the facts common to all Counts set forth in Paragraphs 1 through 76 of this Complaint.

94. A claim for aiding and abetting includes the following elements: "(1) the party whom the defendant aids must perform a wrongful act which causes an injury; (2) the defendant must be regularly aware of his role as part of the overall or tortious activity at the time that he

provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation." *Thornwood, Inc. v. Jenner & Block*, 344 Ill. App. 3d 15, 28-29 (1st Dist. 2003) *quoting Wolf v. Liberis*, 153 Ill. App. 3d 488, 496 (1st Dist. 1987).

95.     An attorney may be liable for "knowingly and substantially assisting a client in the commission of a tort." *Thornwood, Inc.*, 344 Ill. App. 3d at 28.

96.     Herein, Garcia, McNicholas, Kay, and Harper engaged in acts attempting to defraud Birkel of the substantial sums she received from her divorce settlement of approximately ten million ($10,000,000.00) dollars.

97.     Garcia, McNicholas, Kay, and Harper all made numerous misrepresentations concerning an erroneous DOD Contract that would supposedly have paid millions of dollars in returns if Birkel invested in ToyBox.

98.     Garcia, McNicholas, and Harper all pressured Birkel to make her investment as soon as possible, otherwise the opportunity would have been lost.

99.     Garcia, McNicholas, and Harper presented Birkel with false spreadsheets and documents showing returns on investments from a supposed DOD Contract that never existed.

100.     Garcia, McNicholas, and Harper successfully obtained approximately six million three hundred thousand ($6,300,000.00) dollars from Birkel to invest in their fraudulent scheme.

101.     McNicholas knew, or should have known, of his role in Garcia's fraudulent scheme to dupe Birkel out of these funds by concocting a false DOD Contract.

102.     McNicholas knew, or should have known, that his role as Birkel's attorney would cause her to place a great deal of trust in his recommendations.

103.     McNicholas knew, or should have known, that his recommendation to invest in ToyBox would result in Birkel completing that act.

104.    McNicholas knew, or should have known, that his prior involvement as Associate Counsel for President William Clinton would cause Birkel to understand he was privy to confidential government information.

105.    McNicholas knew, or should have known, that by telling Birkel of the veracity of the DOD Contract but refusing to provide her details because she "lacked the required security clearance" she would believe McNicholas based on his prior employment as a ranking government official.

106.    McNicholas knew, or should have known, that by advising Birkel he would be leaving his position as Partner at Sidley Austin to join ToyBox as its General Counsel, this would cause Birkel to believe the investment was indeed, genuine.

107.    McNicholas knew, or should have known, of his role in Garcia's scheme to defraud Birkel of over six million three hundred thousand ($6,300,000.00) dollars.

108.    Defendants then knowingly provided substantial assistance to Garcia's scheme to defraud Birkel.  That assistance consisted of the following acts:

A. Statements by McNicholas that he would be leaving Sidley Austin to join ToyBox as General Counsel;

B. Providing written documents and spreadsheets that were, upon information and belief, either prepared by McNicholas or at his direction, that indicated substantial and fictitious profits from ToyBox's supposed DOD Contract;

C. Providing Garcia with an office and official business cards providing the implication that he was an honest and trustworthy Sidley Austin partner without performing an adequate vetting process;

D. Conducting numerous meetings at the Sidley Austin office in Washington D.C. wherein Birkel was pressured to provide startup capital for ToyBox;

E. Statements by McNicholas that Birkel could not be told the details of the alleged DOD Contract because she did not have the required security clearances but vouching for the veracity and existence of the supposed contract; and

F. Preparing documents for and incorporating ToyBox as a legitimate business entity when it's only purpose from onset was for it to be used as a vehicle for

Garcia to defraud Birkel and other victims.

109.    The egregious, willful, and wanton nature of Defendants' actions, which included knowingly providing substantial assistance to Garcia to defraud Birkel of six million three hundred thousand ($6,300,000.00) dollars and knowingly creating and presenting fictitious documents and making statements in support of that fraud are so outside the attorney canons of professional ethics that an award of exemplary damages must be made to prevent further actions of this type.

WHEREFORE, Plaintiff, Carrie Birkel, prays for Judgment against Edward McNicholas, Esq. and Sidley Austin, LLP as set forth below:

A.    For actual damages in a sum in excess of the jurisdiction of this Court according to proof;

B.    For an award of exemplary damages as to be decided by this Court based on the willful, wanton, and egregious nature of the Defendants' actions;

C.    For interest as allowed by law;

D.    For attorneys' fees and costs of suit incurred herein;

E.    For such other and further relief as the Court deems equitable and just.

### Count III – Conspiracy to Commit Fraud

110.    Birkel hereby incorporates by reference the allegations of the facts common to all Counts set forth in Paragraphs 1 through 76 of this Complaint.

111.    The elements of a civil conspiracy claim are: (1) an agreement between two or more persons to participate in an unlawful act or a lawful act in an unlawful manner; (2) an injury caused by the defendant; and (3) an overt act committed in furtherance of the common scheme. *Pawlikowski v. Toyota Motor Credit Corp.*, 309 Ill. App. 3d 550, 564 (2d Dist. 1999).

112.    Here, the evidence is unequivocal that Defendants entered into an agreement with ToyBox Technologies, Inc. on or about July 14, 2014.

113.    That scheme required Defendants to cause ToyBox to be incorporated in the

District of Columbia, Delaware, and California, and for ToyBox to appear to be a functioning and legitimate business entity.

114.    Garcia's fraudulent scheme, with McNicholas' substantial assistance and acquiescence, caused Birkel to invest six million three hundred thousand ($6,300,000.00) in an entity based on a non-existed DOD Contract.

115.    The underlying unlawful acts are the numerous misrepresentations of fact made by Garcia, McNicholas, Kay, and Harper that attempted to show ToyBox would return Birkel's investment and make millions in profits within a short period of time.   These included the following:

> A.  Meetings that occurred on or about September 2014 in Sidley Austin's Washington D.C. office wherein Birkel was advised by McNicholas, Garcia, and Harper of the quality of the investment in ToyBox;
>
> B.  Meetings that occurred on or about September 2014 in Birkel's home in California wherein McNicholas stated he would be leaving Sidley Austin as a Partner to join ToyBox as its General Counsel;
>
> C.  Meetings that occurred on or about October 2014 in Washington D.C. wherein Garcia, McNicholas, and Harper advised and pressured Birkel to invest in ToyBox, or possibly risk losing the alleged DOD Contract;
>
> D.  Statements by McNicholas to Birkel that legitimized the DOD Contract but that McNicholas could not provide details because Birkel did not possess the appropriate security clearances; and
>
> E.  Written documents and spreadsheets that fictitiously provided projected Birkel's return on investment and potential profits from the supposed DOD Contract.

116.    All of these acts demonstrate a scheme or agreement which included Defendants to defraud Birkel.

117.    Defendants knew, or should have known, that their actions were in furtherance of this fraudulent scheme.

118.    Birkel has sustained additional economic, emotional, and out-of-pocket losses and damages to be presented at trial in excess of $1,508,877.28.

119.    Defendants have committed overt acts, including those listed above, in furtherance of the scheme to defraud Birkel.

120.    The egregious, willful, and wanton nature of Defendants' actions, which included knowingly providing substantial assistance to Garcia to defraud Birkel of six million three hundred thousand ($6,300,000.00) dollars and knowingly creating and presenting fictitious documents and making statements in support of that fraud are so outside the attorney canons of professional ethics that an award of exemplary damages must be made to prevent further actions of this type.

WHEREFORE, Plaintiff, Carrie Birkel, prays for Judgment against Edward McNicholas, Esq. and Sidley Austin, LLP as set forth below:

A.    For actual damages in a sum in excess of the jurisdiction of this Court according to proof;

B.    For an award of exemplary damages as to be decided by this Court based on the willful, wanton, and egregious nature of the Defendants' actions;

C.    For interest as allowed by law;

D.    For attorneys' fees and costs of suit incurred herein;

E.    For such other and further relief as the Court deems equitable and just.

## Count IV – Breach of Fiduciary Duty

121.    Birkel hereby incorporates by reference the allegations of the facts common to all Counts set forth in Paragraphs 1 through 76 of this Complaint.

122.    In order to properly state a cause of action for breach of fiduciary duty, it must be alleged that: (1) a fiduciary duty exists between the parties; (2) that the fiduciary duty was breached; and (3) that such breach proximately caused the injury of which the plaintiff complains. *Neade v. Portes*, 193 Ill.2d 433, 444 (2000).

123.    The fiduciary duties owed by an attorney to a client exist as a matter of law. These duties owed are without regard to the specific terms of any contract or engagement. *Kling*

*v. Landry*, 292 Ill. App. 3d 329, 335-336 (2d Dist. 1997).

124.    Herein, the acts committed by Defendants constitute a breach of the fiduciary duty owed to Birkel, above and beyond mere legal malpractice.

125.    Defendants have placed their profits, fees, and possible financial success ahead of their duty to represent Birkel.

126.    Defendants have provided false or misleading information, substantially assisted another client in the perpetration of a fraudulent scheme against Birkel, allowed and substantially assisted in another client to defraud Birkel of six million three hundred thousand ($6,300,000.00) dollars.

127.    Defendants have provided the means and necessary credentials to Garcia to perpetrate this fraud by providing Garcia and his "Strategic Investigative Services, Inc." with status as a Sidley Austin, LLP Partner.  *See* **Exhibits 2, 3** and **6.**

128.    Defendants have used their knowledge of Birkel, gained through confidential communications through an attorney-client relationship to their advantage, and turned her trust of "her attorney," Edward McNicholas, against her.

129.    Because of the egregious and willful Defendants' actions, which included creating and presenting fictitious documents and making statements in support of Garcia's fraudulent scheme, Birkel sustained additional economic, emotional, and out-of-pocket losses and damages to be presented at trial in excess of $1,508,877.28.

130.     Defendants' actions are so outside the attorney canons of professional ethics that an award of exemplary damages must be made to prevent further actions of this type.

WHEREFORE, Plaintiff, Carrie Birkel, prays for Judgment against Edward McNicholas, Esq. and Sidley Austin, LLP as set forth below:

A.  For actual damages in a sum in excess of the jurisdiction of this Court according to proof;

B.  For an award of exemplary damages as to be decided by this Court based on the willful, wanton, and egregious nature of the Defendants' actions;

C.  For interest as allowed by law;

D.  For attorneys' fees and costs of suit incurred herein;

E.  For such other and further relief as the Court deems equitable and just.

Respectfully submitted,
Carrie Birkel


By:/s/ Edward X. Clinton, Jr
One of Her Attorneys

Edward X. Clinton, Jr.
The Clinton Law Firm
111 W Washington Street, Suite 1437
Chicago, IL 60602
312.357.1515
*edwardclinton@icloud.com*